UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2018 JUL 16  P 3: 14

U.S. DISTRICT COURT
NEW HAVEN

| | |
|---|---|
| IN RE APPLICATION FOR SEARCH WARRANT FOR PRECISE LOCATION INFORMATION FOR CELLULAR PHONE WITH CALL NUMBER(S) (787)678-6747 and (203)606-8198 | MISC. NO. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT

Michael A. Fraenza, a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states:

### INTRODUCTION

1. I am a deputized Task Force Officer with the DEA and am currently assigned to the New Haven District Office Tactical Diversion Squad, which is comprised of personnel from the DEA, Wilton Police Department, New Haven Police Department, Bristol Police Department, Shelton Police Department, Wallingford Police Department, and Monroe Police Department,. I have been a DEA Task Force Officer since September 2017. I have been employed as a Police Officer in the State of Connecticut since July 2007 and am currently assigned to the Narcotics Unit in the Detective Bureau of the Wallingford Police Department.

2. During my tenure as a Police Officer and as a Task Force Officer, I have participated in numerous criminal investigations, including investigations into suspected narcotics trafficking. I also have received instruction relative to conducting drug investigations while attending numerous classes, seminars, and conferences at the Police Officer Standards and

1

Training Academy in Meriden, Connecticut. I have written and executed search warrants, which have resulted in the seizure of illegal drugs and evidence of drug violations. Over the past eleven (11) years in law enforcement, I have participated in numerous investigations involving individuals suspected of distributing illegal drugs; coordinated controlled purchases of illegal drugs utilizing confidential informants, cooperating witnesses, and undercover police officers; written, obtained, and coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of illegal drugs; conducted electronic as well as physical surveillance of individuals involved in illegal drug distribution; analyzed records documenting the purchase and sale of illegal drugs; and spoken with informants and subjects, as well as other local, state, and Federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs. In addition, I also receive periodic in-service training relative to conducting drug investigations. As a result of my training and experience, I am familiar with the behaviors, methods, and common practices of persons and organizations that illegally traffic and distribute controlled substances, as well as the devices commonly utilized by them.

3. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for federal felony offenses. I am a co-case agent on the investigation that is the subject of this affidavit and have personally participated in the investigation concerning violations of the federal laws listed in this affidavit.

4. On June 19, 2018, the government made an application for a warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) authorizing agents of the DEA, Task Force Officers to ascertain for a period of 30 days the physical location of: the cellular telephone assigned call numbers 787- 678-6747, subscribed in the name of **NO NAME, NO ADDRESS** (hereafter referred to as "**Target Telephone 1**"), with services provided by T-Mobile, and 203-606-8198, subscribed in the name of **NO NAME, NO ADDRESS** (hereafter referred to as "**Target Telephone 2**"), with service provided by T-Mobile. The location information requested (the "Requested Location Information") includes but is not limited to, E-911 Phase II data (or other precise location information) concerning the **Target Telephone 1 and Target Telephone 2** (collectively referred to as the "Target Telephones"), which are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. On the same date, the government also applied for an Order authorizing the installation and use of pen-register devices or processes, trap-and-trace devices or processes, and the disclosure of certain electronic communications records and/or information, with regard to the Target Telephones (hereafter referred to as "Pen Register Information") for a sixty-day period. Both applications were granted.

5. I submit this affidavit in support of an application for a warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) authorizing agents of the DEA, Task Force Officers, and members of the United States Marshals Service (USMS) to ascertain for a period of 30 days the physical location of: the cellular telephone assigned call number(s) (787)678-6747, subscribed in the name of **NO NAME, NO ADDRESS ("Target Telephone 1")**, with services provided by T-Mobile and (203)606-8198, subscribed in the name of **NO**

NAME, NO ADDRESS ("**Target Telephone 2**"), with service provided by T-Mobile. The location information requested (the "Requested Information") includes but is not limited to, E-911 Phase II data (or other precise location information) concerning the **Target Telephone 1 and Target Telephone 2**, which are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

6. This affidavit sets forth facts and evidence that are relevant to the requested court orders, but does not set forth all the facts and evidence that I have gathered during the course of the investigation of this matter. The statements contained in this affidavit are based, in part, on my personal knowledge; on information provided by agents and task force officers of the DEA; on information developed through consensual recordings, controlled purchases of narcotics, and physical surveillance; on information provided by confidential informants and cooperating witnesses; on analysis of telephone call detail records and telephone subscriber information; and on review of Connecticut Department of Motor Vehicles and court records.

7. I have personally participated in this investigation and am familiar with the facts and circumstances of the offenses described herein. The information contained in this affidavit is based on this familiarity, and upon information which I have reviewed and determined to be accurate and reliable. Since this affidavit is being submitted for the limited purpose of the aforementioned authorization, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the foundation necessary to support the issuance of the requested court order.

8. Probable cause exists to believe that the Requested Information will constitute or lead to evidence of offenses involving conspiracy to possess with intent to distribute and

4

distribution of narcotics in violation of Title 21, United States Code, Sections 841, 843, and 846 (the "Target Offenses"), as well as the identification of individuals who are engaged in the commission of these offenses. For the reasons set out in this affidavit, there is probable cause to believe Heriberto "Cayey" COTTO is using **Target Telephone 1** and **Target Telephone 2** to commit the Target Offenses along with other phone numbers yet to be identified.

## PROBABLE CAUSE

9. Heriberto "Cayey" COTTO, DOB 12-29-1980, is believed to be active distributor of heroin in and around New Haven, Connecticut. This belief is based, in part, on information from two (2) DEA Confidential Sources (CS); multiple controlled purchases of heroin directly from COTTO utilizing a DEA undercover Task Force Officer as well as a DEA Confidential Source (CS), call detail records, surveillance, and other information developed during the course of this investigation that I have determined to be accurate and reliable based on my training and experience.

### Information Obtained from DEA CS-18-157344

10. In or around February 2018, DEA CS 18-157344, hereinafter referred to as the CS, met with law enforcement officers and indicated that he/she was willing to cooperate with federal and state authorities. The CS stated that he/she could purchase heroin from Heriberto COTTO in New Haven, Connecticut. The CS indicated that he/she arranges heroin purchases from COTTO by calling (**Target Telephone 1**), (787)678-6747. The CS further stated that this phone is held by COTTO.

### Use of the Target Telephone(s) to Traffic Heroin

5

11. During the week of February 15, 2018, members of the Drug Enforcement Administration (DEA) New Haven District Office (NHDO) Tactical Diversion Squad (TDS) met with the CS at a predetermined location within the City of New Haven. In the presence of investigators, the CS contacted COTTO on **Target Telephone** 1 and ordered ten (10) bundles of heroin. COTTO instructed the CS to meet him in the area of Forbes Avenue and Wheeler Street in New Haven and to contact him on **Target Telephone 1** when he was in the area. Prior to the transaction, the CS was searched and provided with an amount of DEA serialized OAF to facilitate the transaction. The CS was also equipped with a covert audio recording device. Investigators subsequently dropped off the CS in an area of New Haven and maintained constant surveillance on him/her throughout the transaction. During surveillance, investigators observed the CS meet with a male identified as COTTO at the intersection of Forbes Avenue and Wheeler Street. The CS and COTTO conducted a brief hand-to-hand exchange before parting ways.

12. Upon completing the transaction, the CS returned to a predetermined location where he/she met with investigators and provided them with ten (10) bundles of heroin in which he/she purchased from COTTO as well as the covert recorder. The CS stated that COTTO handed him/her the heroin in exchange for the sum of DEA OAF agents provided him/her prior to the transaction. The CS also stated that he/she asked COTTO if he would be able to get him/her grams of heroin rather than bundles. COTTO stated that he sells heroin for $80.00 per gram and would be able to facilitate the CS's request of twenty five (25) to fifty (50) grams.

13. During the week of March 08, 2018 members of the DEA NHDO TDS formulated plans to conduct a controlled purchase of eight (8) bundles of heroin from COTTO in the area of Dunkin Donuts located at 189 Forbes Avenue New Haven, Connecticut. Investigators met with

the CS in a predetermined location where he/she made a telephone call to COTTO, in the presence of investigators, on his cellular phone, (787)678-6747, asking him for the heroin. COTTO instructed the CS to walk to Dunkin Donuts located at 189 Forbes Avenue New Haven to complete the deal. Investigators subsequently searched the CS to ensure that he/she was free of money and contraband. The search yielded negative results. Investigators provided the CS with an amount of DEA Serialized OAF as well as a covert recording device to record the transaction. The CS left the predetermined location and began walking towards the meet location. Investigators subsequently observed the CS meet with a male identified as COTTO in a parking lot at the intersection of Forbes Avenue and Wheeler Road where they conducted a brief hand-to-hand exchange. After the hand-to-hand exchange, the CS and COTTO walked a short distance around the rear of the building and could be seen by investigators talking to one another. They parted ways a short time later.

14. Upon returning to the predetermined location, the CS where he/she provided investigators with eight (8) bundles of heroin he/she received from COTTO. The CS stated that he/she inquired about purchasing grams of heroin from COTTO or meeting his heroin "connect" in order to purchase them. The CS stated that COTTO told him to "forget about the connect" and that if he/she needed heroin in the form of grams, he sells them for $80.00 per gram.

### Information obtained from DEA CS 18-158162

15. During the month of April 2018, TFO Fraenza met with DEA CS 18-158162 in New Haven, Connecticut. The CS informed TFO Fraenza that he/she can purchase heroin from COTTO. The CS further stated that he/she has been purchasing two (2) to three (3) bundles of heroin from COTTO every other day for approximately the last two (2) years. The CS stated that

7

<mark>Case 3:18-mj-01143-RMS Document 79-1 Filed 01/23/20 Page 15 of 23</mark>
<mark>Case 3:18-mj-01143-RMS *SEALED* Document 1-1 Filed 07/16/18 Page 8 of 20</mark>

he/she contacts COTTO on his cellular telephone, (787)678-6747, when he/she wants to purchase heroin. The CS also stated that he/she would be willing to introduce an undercover Task Force Officer to COTTO in order to conduct controlled buys.

16. During the week of May 02, 2018 members of the DEA NHDO TDS facilitated a controlled purchase of heroin from COTTO utilizing the CS and an undercover Task Force Officer (hereinafter referred to as the UC). Prior to conducting the controlled purchase, investigators met with the CS and the UC at a predetermined location in New Haven, Connecticut. The CS contacted COTTO on his cellular telephone, (787)678-6747, in the presence of investigators and asked him if he/she could purchase one (1) bundle of heroin from him. COTTO instructed the CS to meet him in the area of Wheeler Street and Forbes Avenue in New Haven to complete the transaction. The UC was then provided with an amount of DEA serialized OAF. The UC and the CS then drove to the meet location and surveillance was maintained on them by investigators throughout the transaction. Once at the meet location, investigators observed a male identified as COTTO walking in the parking lot towards the UC's vehicle. COTTO approached the CS, who was on the passenger side, and conducted a brief hand-to-hand exchange before walking to the rear of the building. The UC then drove away and met with investigators at a predetermined location. Once at the predetermined location, the UC provided investigators with the heroin purchased from COTTO. The UC stated that he handed the CS the buy money and he/she subsequently handed the money to COTTO who in return handed the heroin to the CS.

16. During the week of May 09, 2018, TFO Fraenza spoke to the CS who informed him that COTTO had changed provided him/her with another phone number (203)606-8198. The CS stated that COTTO told him/her to call him on that phone number first when he/she wanted to

8

buy heroin. Members of the DEA NHDO TDS subsequently formulated plans to conduct a controlled purchase of heroin from COTTO utilizing the CS and the UC. The CS met with investigators and made telephone contact with COTTO on his cellular phone, (203)606-8198, and asked him if he/she could get three (3) bundles of heroin. COTTO told the CS that he was "good" and to meet him at "his work" (Onofrio Food Distributors located at 35 Wheeler Road New Haven). Investigators provided the UC with $240.00 worth of DEA Serialized OAF as well as two forms of covert recording devices (lighter and Kell phone). The UC proceeded to drive with the CS, in the UC's vehicle, to the area of Wheeler Road and Forbes Avenue. Investigators followed behind the UC's vehicle, maintaining constant surveillance on the UC and CS until they arrived at the meet location.

17. Upon arrival at the meet location, members of the NHDO TDS and Task Force conducted surveillance during the transaction. Investigators stated through radio communications that COTTO was on scene, standing next to a picnic table near a taco truck, wearing a grey colored hoodie. Investigators also informed the surveillance detail that COTTO arrived in a blue Toyota Highlander bearing Connecticut registration AG84349. A query of the vehicle's registration showed that it came back registered to Yahaira LEON of 5 Rockview Circle New Haven. Investigators know LEON to be COTTO's girlfriend. While conducting surveillance, Investigators observed the UC and the CS pull into a parking space next to where COTTO was standing. COTTO proceeded to walk towards the front passenger seat of the UC's vehicle at which time they conducted what appeared to be a hand-to-hand exchange. After the brief exchange, they parted ways. COTTO returned to the area around the taco truck and continued to have conversations with patrons in the area.

9

18. The CS and the UC returned to a predetermined location where the UC provided investigator with the three (3) bundles of heroin purchased from COTTO. The UC stated that during the transaction, he asked COTTO if he could call him from now on and deal with him directly. The UC stated that COTTO replied yes and told him to text him his phone number.

19. During the week of May 15, 2018, the NHDO TDS and Task Force formulated plans to conduct a controlled purchase $800.00 worth of heroin from COTTO in the area of Forbes Avenue and Wheeler Road in New Haven, Connecticut. Investigators subsequently met with the UC at a predetermined location. The UC had been in contact with COTTO earlier via cellular telephone, (203)606-8198 and ordered ten (10) bundles of heroin. While investigators were with the UC, he received a telephone call from COTTO, 203-606-8198, who inquired as to the UC's current location. The UC informed him that he was getting off the highway and would be there in ten minutes. COTTO instructed the UC to go to "the same place as last time" (parking lot next to a taco truck on the corner of Wheeler Road and Forbes Avenue). Investigators followed behind the UC's vehicle from the predetermined meet location until he reached the meet location at the intersection of Forbes Avenue and Wheeler Road.

20. Upon the UC arriving at the meet location, members of the TDS and Task Force maintained surveillance on the UC throughout the transaction. Investigators observed COTTO parking his vehicle, a red Toyota Corolla bearing Connecticut registration 4ALAE0, on the side of the Onofrio Food Distributors building located at 35 Wheeler Road New Haven. A query through COLLECT shows that this vehicle is registered to COTTO's girlfriend, Yahira Leon of 5 Rockview Circle Apartment D New Haven, Connecticut. Investigators observed COTTO walk around the building and meet with the UC who was seated inside his vehicle. Investigators

10

observed COTTO standing next to the front driver side door of the UC's vehicle for a short period of time, before COTTO walked away and entered a back doorway of Onofrio Foods. Investigators followed the UC vehicle out of the meet location and subsequently met with him at a predetermined location in New Haven.

21. The UC subsequently provided investigators with the ten (10 bundles of heroin he purchased from COTTO. The UC informed investigators that COTTO told him he was going to charge him $70.00 per bundle the next time he purchased heroin from him rather than $80.00 he previously charged him.

22. During the week of May 18, 2018 the DEA NHDO TDS and Task Force facilitated plans to conduct a controlled purchase of heroin from COTTO in New Haven, Connecticut. The UC contacted COTTO on his cellular telephone, 203-606-8198, and asked him if he could purchase $1,400.00 worth of heroin from him. COTTO told the UC that he had the heroin on him and that he would meet him by the taco stand in the parking lot at the intersection of Forbes Avenue and Wheeler Road in New Haven to complete the transaction.

23. Investigators met with the UC in a predetermined location and provided him with two forms of covert recording devices (Kel hat and Kel phone) as well as $1,400 worth of DEA Serialized OAF. Investigators then followed behind the UC from the predetermined location until they arrived at the meet location on Forbes Avenue and Wheeler Road, while maintaining constant surveillance on the UC. Upon arriving at the meet location, investigators maintained surveillance on the UC. The UC received a telephone call from COTTO informing him that he was fifteen minutes out. The UC then left the parking lot and informed COTTO to call him when

he got there. Investigators subsequently followed behind the UC as he left the parking lot and followed him to a predetermined location.

24. Approximately twenty minutes later the UC received a telephone call from COTTO informing him that he would be at the meet location in approximately five minutes. Investigators followed behind the UC until he reached the meet location. While the UC was parked in the parking lot next to the taco stand, investigators observed a male investigators recognized as COTTO, exit a blue Toyota Highlander bearing Connecticut registration AG84349. Investigators know COTTO to operate this vehicle and know it is registered to his wife, Yahaira LEON. Investigators observed a female known to be LEON operating the vehicle. Investigators observed COTTO walk around the rear of the Onofrio Foods building, located at 35 Wheeler Road, and approached the front driver side window of the UC vehicle. COTTO then conducted a brief hand-to-hand exchange with the UC before walking parting ways and walking around the back parking lot area of Onofrio Foods. Upon completing the hand-to-hand exchange, the UC left the parking lot and returned to a predetermined location. Investigators followed behind the UC to the predetermined location and maintained surveillance on him at all times.

25. Upon meeting at the predetermined location, the UC provided investigators with twenty (20) bundles of heroin he purchased from COTTO. The UC also stated that COTTO informed him that the next time he purchased heroin from him he would charge him $65.00 per bundle. The UC also inquired as to how much he would sell him a gram of loose heroin. COTTO replied that he would check on prices and get back to him.

26. During the week of June 10, 2018, the UC received a text message from COTTO on his cellular telephone, (203)606-8198, **Target Telephone 2,** stating that he would charge him

12

$85.00 per gram of loose heroin or $65.00 per bundle. The UC subsequently ordered ten (10) grams of loose heroin from COTTO. COTTO instructed the UC to meet him at the taco stand at the intersection of Forbes Avenue and Wheeler Street to complete the transaction. Investigators met with the UC and provided him with $850.00 worth of DEA serialized OAF as well as a covert recording device. Investigators then followed the UC to the meet location.

27. Once at the meet location, investigators observed COTTO as well as two Hispanic males walking towards the UC's vehicle. The two males walked past the UC's vehicle while COTTO approached the from driver side. While the transaction was occurring, investigators heard live feed from the covert recorder being utilized by the UC. The UC and COTTO conducted a hand-to-hand exchange and held a brief conversation. The UC told COTTO that he could get rid of twenty five (25) grams of heroin and asked if COTTO could get him that much. COTTO told the UC that he could and to "let him know". They then parted ways at which time investigators observed COTTO and the two Hispanic males meet up and enter then package store located in the front of the parking lot of 35 Wheeler Road. The UC then returned to a predetermined location where he provided investigators with the ten (10) grams of heroin purchased from COTTO.

28. On July 02, 2018, the UC contacted COTTO on his cellular telephone, 203-606-8198, **Target Telephone 2,** and requested a meeting in order to discuss a heroin transaction. COTTO subsequently agreed to meet with the UC in a parking lot at the intersection of Wheeler Street and Forbes Avenue in New Haven, Connecticut. Prior to the meet, TFO Fraenza and TFO Wethered met with the UC and provided him with an audio and visual covert recording device as well as a Kell phone in order to receive live feed audio during the meet. TFO Fraenza and TFO

13

Case 3:18-mj-01143-RMS *SEALED*   Document 1-1   Filed 07/16/18   Page 14 of 20

Wethered subsequently followed the UC to the meet location at which time members of the TDS assisted in surveillance.

29. While conducting surveillance, TFO Monk and SA Lang observed COTTO walking from the middle portion of the parking lot towards the UC's vehicle. COTTO proceeded to walk to the front driver side window and engage in a conversation with the UC.

30. TFO Wethered monitored the live feed from the Kell phone and heard the UC ask COTTO if he could get him twenty five (25) grams of heroin. COTTO replied by telling the UC that he could get it for him and that he was going to have to call his connect to see if he could get it that day or the next morning. Prior to returning to the parking lot, COTTO informed the UC that he would contact his connect and get right back to the UC.

31. TFO Fraenza and TFO Wethered subsequently met with the UC in a predetermined location to await a return phone call from COTTO. Approximately five minutes later, COTTO contact the UC and told him that he would be able to get him the twenty five (25) grams of heroin the following morning. COTTO informed the UC that he would contact him with a price when he had the heroin in his possession.

32. On July 03, 2018, the UC received multiple phone calls from COTTO from both of his cellular telephone numbers, 203-606-8198, **Target Telephone 2,** and 787-678-6747, **Target Telephone 1**. The UC initially missed the phone calls however he eventually picked up a call from 203-606-8198, **Target Telephone 2,** and spoke to COTTO. During the phone call COTTO informed him that he had the heroin and would charge him $70.00 per gram ($1,760.00)

14

total. The UC responded to COTTO that he would meet with him in the morning to complete the transaction.

33. TFO Fraenza and TFO Wethered met with the UC at a predetermined location and provided him with a covert audio and video recorder as well as a Kell phone to provide live feed audio during the transaction. The UC subsequently contacted COTTO on his cellular telephone, 203-606-8198, **Target Telephone 2,** and told him that he was en route to meet him to complete the transaction. TFO Fraenza then provided the UC with $1,760.00 worth of DEA Serialized OAF and followed him from the predetermined location to the meet location which was located at the corner of Wheeler Street and Forbes Avenue in New Haven.

34. Upon arriving at the meet location, surveillance was maintained by SA Lugo, SA Lang, SA Edwards, SA Cogan, and TFO's Trahan, Chaves, McPadden, Monk and Vasquez. TFO Monk and SA Cogan observed the UC vehicle pull into the parking lot at the intersection of Wheeler Street and Forbes Avenue. TFO Fraenza and TFO Wethered observed COTTO exiting the front door of the Grapes and Grains package store and begin walking towards the UC's vehicle. COTTO subsequently walked to the front driver side window of the UC's vehicle, leaned inside the window and exited several second later. While the transaction was being conducted, TFO Fraenza and TFO Wethered heard COTTO tell the UC through the live feed Kell phone that he could "play around with this a little bit". Through his training and experience, TFO Fraenza knows that COTTO was referring to "cutting" the heroin with cutting agents in order to increase the quantity. The UC and COTTO then parted ways at which time TFO Fraenza and TFO Wethered followed the UC from the meet location to a predetermined location. Upon arrival at

the predetermined location, the UC transferred custody of the heroin to TFO Fraenza, as witnessed by TFO Wethered. The heroin was later weighed at approximately 25 grams and field tested which yielded a positive presumptive test for the presence of heroin.

## AUTHORIZATION REQUEST

35.     Based on the foregoing, there is probable cause to believe that the Requested Information will lead to evidence regarding the activities described above. Based upon all of the foregoing facts, as well as my training and experience, I believe that there is probable cause to believe that COTTO is currently using **Target Telephone 1** and **Target Telephone 2** in furtherance of his drug trafficking activity and that the Requested Information will help agents locate COTTO whereabouts, the locations where he stores and sells narcotics, and the location and identity of his supplier(s). In my experience, drug traffickers usually carry their cellular telephones on their persons to narcotics transactions to facilitate the meetings and to keep track of the whereabouts of their associates en route to a meet location. In addition, having a cellular telephone on their persons allows them to conduct business more efficiently and while on the move, even when they visit "stash" locations or sources of supply. Drug dealers such as members of this organization are constantly on the move throughout the day and night and, by keeping their cellular telephones on their persons, they can remain in frequent communication with their drug trafficking associates so as to keep track of their whereabouts if a drug transaction has been planned and is imminent. This also allows the planning of other transactions to take place while concluding one transaction so that business is constantly underway. Finally, having a cellular telephone in close proximity allows a deal location to be changed at the last possible moment,

16

which is a common counter-surveillance technique used by drug dealers. Drug traffickers also frequently store information pertaining to their drug trafficking associates in their telephones, such as contact numbers and text messages. Accordingly, there is probable cause to believe that the Requested Information will lead to the location of **Target Telephone 1** and **Target Telephone 2**, and to evidence related to narcotics trafficking.

36. WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and order authorizing the DEA to obtain the Requested Information for a period of thirty (30) days.

37. IT IS FURTHER REQUESTED that the Court direct T-Mobile to assist agents of the DEA by providing all information, facilities, and technical assistance needed to ascertain the Requested Information, and further direct Sprint, the service provider for **Target Telephone 1** and **Target Telephone 2**, to initiate a signal to determine the location of **Target Telephone 1** and **Target Telephone 2** on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed warrant, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the user(s) of **Target Telephone 1** and **Target Telephone 2** for a period of thirty (30) days. Reasonable expenses incurred pursuant to this activity will be processed for payment by the DEA.

38. IT IS FURTHER REQUESTED that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Target Telephone 1** and **Target Telephone 2** outside of daytime hours. Indeed, drug traffickers frequently conduct their business

during night-time hours, and thus it will be necessary to determine the location of **Target Telephone 1** and **Target Telephone 2** during night-time hours.

39. IT IS FURTHER REQUESTED that this affidavit, the accompanying warrant and application, and the requested court orders, as they reveal an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on agents and task force officers of the DEA, other law enforcement officers, other government and contract personnel acting under the supervision of such investigative or law enforcement officers, and Sprint, as necessary to effectuate the requested orders.

40. IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of thirty (30) days after the termination of the monitoring period authorized by the warrant or any extensions thereof, because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation.

Michael A. Fraenza
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me this /L th day of July 2018, at New Haven, Connecticut.

/s/

Honorable Robert Spector
United States Magistrate Judge
District of Connecticut

**ATTACHMENT A**

18

**Property to Be Searched**

1. The cellular telephones assigned call number (787)678-6747 (the "**Target Telephone 1**") and (203)606-8198 (the "**Target Telephone 2**"), whose wireless service provider is T-Mobile.

2. Information about the location of **Target Telephone 1** and **Target Telephone 2** that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

**Particular Things to be Seized**

All information about the location of the **Target Telephones** described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the **Target Telephones** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint services, including by initiating a signal to determine the location of **Target Telephone 1** and **Target Telephone 2** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).